ELECTRONICALLY FILED
COURT OF COMMON PLEAS
Friday, December 13, 2019 4:49:12 PM
CASE NUMBER: 2019 CV 05957 Docket ID: 34118728
MIKE FOLEY
CLERK OF COURTS MONTGOMERY COUNTY OHIO

## IN THE COMMON PLEAS COURT OF MONTGOMERY COUNTY, OHIO
### CIVIL DIVISION

STATE OF OHIO, ex rel.    :
**JANELL SMITH**       **CASE NO.**
8901 Gardengate Dr.    :
Huber Heights, OH  45424  **JUDGE**
           :
-and-
           :

STATE OF OHIO, ex rel.    :
**UNKNOWN TAXPAYERS OF THE**
**CITY OF HUBER HEIGHTS**  :

  **Plaintiffs-Relators and Taxpayers** :
  **on behalf of all those similarly**
  **situated**        :

**v.**           :

**THE CITY OF HUBER**    :
**HEIGHTS, OHIO**
6131 Taylorsville Road    :
Huber Heights, OH 45424
           :
-and-
           :

**MARK A. CAMPBELL**
Individually and in his capacity  :
as Huber Heights Council Person
6131 Taylorsville Rd.    :
Huber Heights, OH  45424
           :
-and-
           :

**EDWARD W. LYONS**
Individually and in his capacity  :
as Huber Heights Council Person
6131 Taylorsville Rd.    :
Huber Heights, OH  45424
           :
-and-



EXHIBIT
B-1

**NANCY BYRGE**                               :
Individually and in her capacity
as Huber Heights Council Person               :
6131 Taylorsville Rd.
Huber Heights, OH 45424                        :

-and-                                          :

**DONALD E. WEBB**                            :
Individually and in his capacity
as Huber Heights Council Person               :
8801 Classic Ct.
Huber Heights, OH 45424                        :

-and-                                          :

**ANTOINETTE WEBB**                           :
8801 Classic Ct.
Huber Heights, OH 45424                        :

-and-                                          :

**HUBER HEIGHTS WARD 2 UNITED**               :
**FOR A BETTER TOMORROW**
A Political Action Committee (PAC)             :
4030 Forestedge St.
Tipp City, OH 45371                            :

-and-                                          :

**WALTER R. STURGEON**                        :
2544 Sunset Maple Dr.
Tipp City, OH 45371                            :

-and-                                          :

**KIMBERLY KOZLOWSKI**                        :
6040 E. Gander Road
Dayton, OH 45424                               :

-and-                                          :

**GERALD C. GUSTIN**                          :
**A/K/A BRUNO VOTTO**
6946 Breckenwood Dr.                           :
Huber Heights, OH 45424

2

|                                                      |     |
|------------------------------------------------------|-----|
| -and-                                                | :   |
|                                                      | :   |
| **ROBERT B. SCHOMMER**                               | :   |
| Individually and in his capacity                     |     |
| as Huber Heights City Manager                        |     |
| 6131 Taylorsville Rd.                                | :   |
| Huber Heights, OH 45424                              |     |
|                                                      | :   |
| -and-                                                |     |
|                                                      | :   |
| **JEFFREY S. GORE**                                  |     |
| Individually and in his capacity                     | :   |
| as Huber Heights Mayor                               |     |
| 6131 Taylorsville Rd.                                | :   |
| Huber Heights, OH 45424                              |     |
|                                                      | :   |

**Defendants-Respondents.**

## COMPLAINT WITH JURY DEMAND ENDORSED HEREON

Now come Plaintiffs-Relators, State of Ohio ex rel. Janell Smith (hereinafter "Smith") and Unknown Taxpayers of the City of Huber Heights, by and through counsel, and for their complaint against Respondents-Defendants The City of Huber Heights, Ohio, Mark A. Campbell, Edward W. Lyons, Nancy Byrge, Donald E. Webb, Antoinette Webb, Huber Heights Ward 2 United for a Better Tomorrow, Walter R. Sturgeon, Kimberly Kozlowski, Gerald C. Gustin a/k/a Bruno Votto, Robert B. Schommer and Jeffrey S. Gore (collectively "Defendants"), and do hereby state as follows:

### PARTIES, JURISDICTION AND VENUE

1.  Plaintiff Janell Smith ("Smith") was a former council member for the City of Huber Heights, beginning her term in January of 2016, with that term ending in November of 2018. Smith is also a taxpayer of the City of Huber Heights, residing at 8901 Gardengate Dr., Huber

3

Heights, OH 45424.  She brings this suit on behalf of herself, as well as on behalf of all taxpayers in the City of Huber Heights.

2. Plaintiffs Unknown Taxpayers of the City of Huber Heights, Ohio, are taxpayers residing in Huber Heights, Ohio, and bring this suit on behalf of all other similarly situated taxpayers and relators for mandamus and other equitable relief as set forth in the causes of action hereinafter.

3. Defendant The City of Huber Heights, Ohio, is a charter municipality in the state of Ohio ("the City").

4. Defendant Mark A. Campbell ("Campbell") is a current councilmember for the City with over 30 years on the Council and a resident of Montgomery County, Ohio.

5. Defendant Edward W. Lyons ("Lyons") is a current councilmember for the City and a resident of Montgomery County, Ohio.

6. Defendant Nancy Byrge ("Byrge") is a current councilmember for the City and a resident of Montgomery County, Ohio.

7. Defendant Donald E. Webb ("Webb") is a current councilmember for the City and a resident of Montgomery County, Ohio.

8. Defendant Antoinette Webb ("Mrs. Webb") is the spouse of current councilmember Don Webb and a resident of Montgomery County, Ohio.

9. Defendant Huber Heights Ward 2 United for a Better Tomorrow (the "PAC") is a political action committee organized on or around June 15, 2018.

10. Defendant Walter R. Sturgeon is the organizer of the Huber Heights Ward 2 United for a Better Tomorrow Political Action Committee and a resident of Miami County, Ohio.

11. Defendant Kimberly Kozlowski is a PAC supporter and a resident of Montgomery County, Ohio.

4

12. Defendant Gerald C. Gustin a/k/a Bruno Votto ("Gustin") is a former police detective of the City and a resident of Montgomery County, Ohio.

13. Defendant Robert B. Schommer ("Schommer") is the current City Manager of the City and former Chief of Police of the City and a resident of Montgomery County, Ohio.

14. Defendant Jeffrey S. Gore ("Gore") is the current Mayor of the City and a resident of Montgomery County, Ohio.

15. This Court has jurisdiction over the subject matter under the Huber Heights City Charter, R.C. §2035.01, R.C. Chapters 123, 733, et seq., R.C. §4112.02, et seq, R.C. Chapter 2721, R.C. Chapter 2723, R.C. Chapter 2727, and R.C. Chapter 2731. (Relief may not be sought under R.C. Chapter 2733 by writ of quo warranto, but said relief will have to be granted by a superior court with said jurisdiction, if necessary; but appropriate relief must here be granted to provide similar and additional relief, as provided by law and equity.)

16. Venue is appropriate pursuant to Civ.R. 3(1), (3) and (4).

## BACKGROUND FACTS

17. Smith incorporates all prior paragraphs of this complaint as if fully rewritten herein.

18. Smith was elected to serve as councilmember for Ward 2 of the City of Huber Heights in or about November of 2015. Smith's term began in January of 2016.

19. Upon being sworn in as councilmember, Smith was afforded with all the protections afforded under the laws of Ohio, including the City Charter, City Rules, Ohio Constitution, State statutes and common law.

20. In her tenure as a councilmember, Smith was responsible for many, many projects, and was involved in several committees.

21. By all accounts, Smith was an excellent member of the City Council and performed her duties in a precise and diligent manner, bringing unprecedented statewide accolades and recognition to the City for multiple initiatives.

22. Smith decided to run for election because she cared deeply for the Huber Heights community.

23. Smith had observed a City Council and City Administration that appeared to be very tightly controlled by a select few, and she had grave concerns about the close personal relationships that some councilmembers maintained with paid vendors of the City while also being empowered with approving high value contract awards to those vendors. Additionally Smith had genuine uneasiness regarding City-appointed committee members and their immediate family members being paid thousands of dollars as vendors to the City. Smith's goal as a councilmember was to cease the common practice of awarding no-bid contracts particularly for multimillion dollar projects; to reduce emergency legislation that drastically diminished the citizenry's ability to comprehend proposals and provide feedback; to weigh all issues before the Council independently, performing her own research on many issues; and to refrain from giving her approval on an issue unless it promoted the health, safety, and welfare of her constituents and the City as a whole.

24. Smith also personally witnessed illegal quorums being conducted in various locations outside of City chambers and vowed to stop those.

25. Because of her independent approach, Smith was often a lone or minority voice of dissent on the Council. This led to many personal attacks against Smith based on her personal life, character, ability to serve as a councilmember, and more.

26. In June of 2018, a political action committee named "Huber Heights Ward 2 United for a Better Tomorrow" was formed with its sole objective being the forced recall of Smith from her position as councilmember.

6

27. Upon information and belief, the organizing and/or key members of the PAC were close personal friends of Defendant Gore, Defendant Councilmember Ed Lyons, Defendant Councilmember Nancy Byrge, Defendant Toni Webb, and Defendant Don Webb (the current representative of Ward 2 and Smith's successor in addition to husband of Defendant Toni Webb), and Defendant Walter Sturgeon.

28. Some examples of the aforementioned persons' PAC-related activities are as follows:

   a. Defendant Lyons was named as the person who organized petitioner(s) to collect signatures.

   b. Defendant Byrge openly and enthusiastically supported the Recall at the largest polling location in the City on voting day.

   c. Defendant Don Webb and Defendant Toni Webb were PAC financiers and have maintained high-level membership of several Council-appointed positions and committees in addition to being highly paid vendors of the City.

   d. Jen Bierley, a Council-appointed member of the Arts and Beautification Committee, and close personal friend of Defendant Gore, posted multiple pictures throughout social media of her and her minor children posing with oversized RECALL SMITH signs to swing public opinion while also being one of the primary PAC organizers and supporters.

29. The City allowed the unauthorized signs to be publicly displayed even though they violated Huber Heights' sign ordinances. The recall appeared on the November 2018, ballot and Smith was ultimately recalled from office after losing 57.5 percent to 42.5 percent.

30. Smith alleges that during her tenure as a City councilmember, the named Defendants and others conspired to invade Smith's privacy, place her in a false light and defame her, in connection with a smear campaign that led to her being recalled from her position.

31. Further, Smith alleges that the named Defendants who served as members of the City Council discriminated against her based on gender and disability.

32. The aforesaid wrongful efforts to tortiously invade Smith's privacy, slander, libel, and discredit Smith began with an unlawful and malicious disclosure of false information to the press and public by said conspirators, where said conspirators knew said disclosures to be false and with the intention of having the false information published and republished. Some of the publications, libel per quod, libel per se, and slander per se accused Smith of criminal conduct, dishonesty, and incompetence/dishonesty in her job as a councilmember and public duties to the Defendants and taxpayers.

33. Said verbal and written communications were made in violation of the City Council Rules, Ohio Public Meetings (open meetings law) and utilized false or embellished information conveyed to the press and public in order to destroy the career of Smith.

34. Further, upon information and belief, said actions and communications were reviewed and/or endorsed by the City Law Director, Gerald McDonald, who expended taxpayers' money on the matters.

35. On more than one occasion, Defendant Toni Webb, a close friend and neighbor of Defendant Gore, and wife of Smith's successor Defendant Don Webb, was openly permitted by Gore during public meetings to speak significantly longer than the five-minute time limit and to address her remarks and complaints directly toward Smith, all in contravention to the Rules of Council relative to public participation in meetings. These coordinated attacks were designed to besmirch Smith's reputation and to protect the Webb's personal financial interests as paid vendors of the City while they also held high-ranking positions on several boards, commissions, and committees. Having witnessed significant increases in payments

8

to the Webbs, Smith had expressed concerns with the ethical optics of the relationship the Webbs enjoyed with the City.

36. Smith's inadvertently tenuous relationship with the City began several years prior based on official interactions with then chief of police, Defendant Robert Schommer as well as other collaborations with the City. Based on those synergies, Smith developed a rapport with Schommer and observed signs of intimidating and controlling behavior from him that would ultimately continue throughout her tenure as an elected official.

37. Smith's trust of Schommer deteriorated in 2011 after she became concerned and frustrated with Schommer's handling of certain issues in which she had a vested interest in either directly or indirectly, including an incident that ultimately resulted in a child being viciously attacked by an escaped pit bull that had been reported on numerous occasions. In retaliation to her tireless persistence, Schommer began trailing her teenaged son for no reason in an effort to intimidate Smith and her family and after he was exposed, later claimed that Smith requested the surveillance although no record of this request is anywhere to be found.

38. Schommer became the City Manager for the City in 2014.

39. Smith and Schommer's poor professional relationship was based around several circumstances in which Smith believed that Schommer was not adequately performing his duties as well as Schommer's lack of qualifications and/or experience for the city manager position.

40. Soon after Smith took office as a councilmember in January of 2016, Smith, being eager to become familiar with her new responsibilities and honorably serve her constituents, meticulously reviewed City directives and identified several areas in which she believed that the City Council and Schommer were failing to perform satisfactorily per City Charter and Employee Handbook requirements.

9

41. For example, in December of 2016, Smith raised the issue of the City Manager, Schommer, not being a resident of the City in accordance with the City Charter. This issue became a major point of contention as the City Council did not want to require Schommer to live within City limits even though it was mandatory. As a result, the residency issue was placed on the ballot in May of 2017 and was overwhelmingly upheld by the voters. However, the Council continued to evade the requirement and neglected their responsibility to the public in accordance with section 12.06 of the City Charter even as Smith pressed the issue in the following months.

42. To circumvent the process, the defendants employed a strategic plan to ensure at least one of them was absent from Council meetings in order to prevent a legitimate vote on the long-standing mandate. To substantiate this, Smith submitted a public record request for video evidence showing Defendant Ed Lyons secretly positioned in the parking lot during one meeting. Curiously the request was denied because the video was reportedly not accessible by anyone in the City for several days and then erased almost a week after her request.

43. Schommer, in turn, began a campaign of refusing to answer Smith regarding multiple questions she posed to him involving City business. On one of those occasions members of Council had to compel Schommer to answer her. He also made it extremely difficult for Smith to successfully serve her constituents and demonstrate her emphasis on the community by covertly impeding or completely blocking several of her initiatives.

44. In July of 2017, Defendant Schommer submitted a frivolous complaint against Smith alleging that Smith verbally abused and/or threatened Schommer over the phone. This complaint further alleged that Smith was creating a hostile work environment.

45. Immediately after Schommer's complaint was filed and he validated that it was public record, Defendant Ed Lyons posted the entire complaint on social media noting "[t]he personal issue

that Councilwoman Janell Smith has with our city manager seems to continue no matter what the consequences are to the city."

46. In social media "comments" after that post, Defendant Lyons continued to disparage Smith to constituents, calling Smith a liar and unprofessional. Other comments called Smith's character and integrity into question.

47. The complaint was ultimately retracted with no adverse action being taken against Smith and no attempt to remediate the damage was initiated.

48. However, the media obtained copies of the complaint and circulated the information in newspapers, online, and on television.

49. Around this time, Smith learned through Defendant Schommer's complaint that "other lawyers" were being retained to look into matters involving Smith. Accordingly, Smith became worried that certain individuals, unknown at that time, were trying to further impugn Smith's good reputation.

50. Before Defendant Jeff Gore became mayor in January of 2017, Tom McMasters was mayor of the City.

51. In late-October of 2017, Defendant Gore, who at that time was simply running for the mayor position, confronted Smith at the Huber Heights Farmers Market in an aggressive manner while he and Defendant Mark Campbell were campaigning together.

52. During an investigation into the altercation, Huber Heights City Police analyzed Smith's background in multiple law enforcement databases.

53. A few weeks later, Smith began receiving threats that copies of an Indiana police report which detailed a June 2008 assault charge filed against Smith would be posted on social media.

54.   The copy of the police report which was ultimately posted included a mugshot of Smith and an unredacted printing of Smith's social security number, driver's license and other personal identifiable information ("PII") that is protected by the Privacy Act of 1974; this original post was "shared" several times by citizens of Huber Heights and elected officials of the City which has since resulted in several fraudulent credit line accounts being created in Smith's name causing severe adverse consequences to her and her family to this day.

55.   Upon information and belief, this unredacted police report was first obtained and threatened to be posted by Defendant Gerry Gustin (a/k/a Bruno Votto), a former police detective of the City and an individual possibly acting on behalf of the named Defendants. Bruno Votto repeatedly threatened Smith on social media that he had a report about something and would post it. He then harassed Smith by posting a mugshot that was not Smith, quickly taking it down, and then posting a screenshot of her actual intake photograph from the 2008 incident in Indiana. Following that, Defendant Kimberly Kozlowski posted the entire police report exposing Smith and her family members' PII.

56.   Numerous constituents informed Smith that her personal information had been posted on several different "Facebook pages" and blogs. Many of these posts were taken down; however, having this information out in the public domain caused serious stress and embarrassment for Smith who no longer felt that she was safe in her community.

57.   These feelings were exacerbated by the fact that other members of the council, including Mayor McMasters and Defendant Ed Lyons, were freely sharing the information with members of the community and other employees of the City.

58.   Between January of 2017 and December of 2017, Smith heard from multiple sources that she was "aggressive" and had "personal issues" with the City Manager; each of these comments suggested that Smith was unfit for the job.

12

59. During a January 31, 2017, Council meeting, lengthy discussions were held by the Defendants to talk about how a councilmember could be removed from office.

60. Further, it appeared as if there was a constant and ongoing "smear campaign" by the defendants and their friends in the community set at discrediting Smith as personal attacks continuously surfaced in person and on social media.

61. In addition to Defendant Schommer's complaint, unsubstantiated publicized complaints were filed against Smith by Defendant Nancy Byrge, Defendant Toni Webb, and members of the community who were close personal friends of many of the named defendants causing additional public animosity towards Smith.

62. When Defendant Jeff Gore was elected and took office as mayor of the City in January of 2018, this smear campaign worsened exponentially.

63. In January of 2018, while Smith was presiding over a scheduled Work Session per the established Rules of Council, the council voted to suspend all Rules of Council so that new Mayor Gore could choose how to run the meetings; Defendant Gore then decided to run the meeting himself displaying complete distain of governance and humiliating Smith in the public forum.

64. During heated discussions, Defendant Nancy Byrge openly told Smith that "we [the council] don't want you to run the meeting," confirming that the move was another example of the Defendants colluding with one another to isolate Smith. When pressed on the issue, Byrge quickly backtracked and then claimed that she knew nothing about the upcoming change from Smith to Defendant Gore beforehand.

65. Additionally, amid the proceedings, Defendant Gore changed the seating arrangement for council members and moved Smith from a more central location on the dais to the end of the dais. This was a problem for Smith, who has significant hearing problems in both of her ears.

66. Smith informed the Council, as well as Law Director Gerald McDonald, about her hearing disability and politely requested that she be transferred back to her original seat. Smith also requested that "sidebars" no longer happen as it appeared conversations were being held in order to keep Smith "out of the loop."

67. Unfortunately, upon information and belief, McDonald and Defendant Gore refused to move Smith back to her original seat despite knowledge of Smith's inability to hear. Several other councilmembers maintained that seating arrangements should remain where they were based on Ward number before Defendant Gore took office, while Defendant Mark Campbell asserted that, "In reality it doesn't matter where we sit." Despite these positions the Mayor and Law Director refused to move Smith back to her original seat and even ignored Councilmembers Glenn Otto and Richard Shaw's offers to shift seats with her to easily remedy the situation.

68. Over the next several months, Smith was purposely bounced around to five different locations on the dais prompting repeated questions from her constituents and causing a great deal of embarrassment for Smith who wanted to keep her disability private. Instead of returning the seating arrangements to the original and logical Ward number order, the Council, except for Smith, voted to expend over $60,000 of taxpayer money for a new sound system that ultimately did not help Smith's disability. She voted against this initiative as several Councilmembers stated that the upgrade was due to antiquated equipment not necessarily for ADA compliance. Smith apprehensively settled for the most recent arrangement so as to not cause further embarrassment for the City or herself.

69. To continue the orchestrated barrage against Smith, during consecutive January meetings, Defendant Gore and Council removed Smith from two committees (First Tier Suburbs and Miami Valley Regional Planning Committee) only to appoint himself, Mark Campbell and

14

Nancy Byrge as the primary members of the committees. Upon information and belief, Byrge did not actually participate in the committees and was given the position only to ensure that Smith was excluded.

70. In March of 2018, Smith and Defendants Gore, Schommer and Campbell attended a National League of Cities (NLC) conference in Washington DC.

71. During the trip, Defendants Gore, Schommer and Campbell were constantly unfriendly and/or hostile to Smith and intentionally left her stranded at certain seminars and locations on several occasions.

72. At the end of the trip, Defendants Gore, Schommer and Campbell even attempted to leave Smith behind at the hotel as the three men left for the airport without Smith.

73. In April of 2018, Smith's request to attend an NLC conference in Arkansas was denied by Defendant Gore without a basis; however, male councilmembers Glenn Otto and Richard Shaw were still permitted to attend the trip.

74. In July of 2018, Smith's request to attend a pivotal NLC Leadership Conference in Los Angeles was denied despite her being the lone active member of the NLC Military Communities Council in the Miami Valley region. She submitted her request in April of 2018 ahead of other councilmembers, but was the only female and the only one denied while all five men who also requested to attend were approved.

75. In short, during his tenure, Defendant Gore denied each of Smith's travel requests, yet approved all other councilmembers' travel requests.

76. In June of 2018, Smith voted against legislation geared towards a water pressure increase for fire suppression purposes along the Executive Blvd business district. During this meeting, Smith stated that she was not in favor of the initiative and that two staff members had told

her during a meeting regarding another issue that the water pressure increase was not for residential purposes and was not designed to help the pressure issues in North Huber Heights.

77. This off the record confirmation served to substantiate her concerns about the $2.5 million project because she recalled the same information was provided to Council previously by a representative of Burgess and Niple and the Huber Heights City Engineer Russ Bergman both in a public meeting and email threads. Smith even suggested to have the representative return to clear up any questions but the request was denied by Defendant Schommer and the focus was then isolated to identifying the staff members instead of seeking the expert testimony.

78. When Smith was pressed to name the two staff members she refused due to concerns over any retaliation they may experience from Defendant Schommer and that it wasn't important to the overall objective. The experts had already presented these facts to council. However, Defendants Campbell, Schommer, and Gore chose to turn Smith's refusal to name the staff members into a public spectacle in order to inflict as much negative publicity on Smith as possible and use this as the grounds for a recall effort.

79. Although no formal complaint had ever been submitted by anyone, Defendant Schommer stated he was the complainant and conducted an investigation to determine who provided Smith the verification and then publicly stated that he didn't believe the discussion took place. Defendant Schommer didn't interview Smith during his targeted inquiry and the investigation results were discussed in an Executive Session called to discuss a complaint against a "public employee."

80. As indicated above, in June of 2018, a political action committee named Huber Heights Ward 2 United for a Better Tomorrow was formed. This PAC engaged in a malicious pattern of harassment aimed at removing Smith from office.

16

81. In October of 2018, just two weeks before the election, the Council, led by Defendants Mark Campbell and Mayor Jeff Gore, publicly censured Smith for her response to certain actions taken by the PAC and its organizer Defendant Walter Sturgeon. The City and Council provided contrived excuses to the public which insinuated that Smith had done something wrong and that her removal from office was necessary. The recall appeared on the November 2018 ballot and Smith was ultimately recalled from office after losing 57.5 percent to 42.5 percent.

82. Upon information and belief, the named Defendants who were elected by the residents to justly represent them through ethical and transparent actions under the authority of Ohio's public records and open meetings laws(commonly referred to as Sunshine Laws), routinely engage(d) in deceptive and questionable practices through their conduct, creative manipulation of both the City Charter and Rules of Council, and oftentimes, blatant disregard of federal, state, and local statutes.

83. Upon information and belief, the City Council has a reputation of being biased and has been accused of discrimination in the past.

84. Upon information and belief, the named Defendants conspired with each other to remove Smith from her position as council member, and replace her with close friend Don Webb to protect their own personal agendas and financial interests.

85. Upon information and belief, the named Defendants, who are elected by the residents, organized and held several conversations amongst themselves and with their friends in the community outside of public meetings which were aimed at finding ways to remove Smith from her position as a councilmember.

86. Upon information and belief, the named Defendant councilmembers have and continue to employ public undertakings to attempt to discredit and remove colleagues who do not

17

conform to their own personal agendas while grooming their friends to replace those who are disobedient as quickly as possible.

87. Upon information and belief, the named Defendants and City Council have a reputation for engaging in questionable ethical practices and have shown a pattern of collusion that protects those in the "establishment" while blacklisting and publicly shaming and ambushing those who do not fall in line

88. Upon information and belief, the named Defendants, supported by the City Law Director, continue to repeatedly employ and support tactics to silence Smith in the community by blocking her in public forums that are publicized and used as governance tools and controlled by government actors which is in direct violation of Smith's First Amendment Rights.

89. Upon information and belief, the united efforts of the named Defendants and their friends have not only robbed Mrs. Smith of her career ambitions, but have ruined her reputation and caused severe personal and professional consequences to her and her family that will certainly have financial implications for years to come.

## COUNT ONE
### (Breach of Charter; Ultra Vires Conduct)
*Wellston v. Morgan* (1898), 59 Ohio St. 147; *Calco v. Stow* (1981), 9th Dist. No. 9990, 1981 Ohio App. LEXIS 13700

90. Smith incorporates all prior paragraphs of this complaint as if fully rewritten herein.

91. The aforesaid conduct was a violation of the Huber Heights City Charter, as set forth herein, as well as various Ordinances of the City Code of Huber Heights, Ohio.

92. The Defendants have jointly and severally, violated their Ordinances, rules, contracts, agreements, Charter, and law by wrongfully persecuting, harassing and defaming Smith.

93. The aforesaid violations of Charter, Ordinances, Contracts, Rules, and law as well as wrongful conduct, is ultra vires conduct, entitling Plaintiff to compensatory and punitive

18

damages against all individual Defendants, jointly and severally, and the City of Huber Heights (pursuant to the intentional tort, R.C. § 2901.24, R.C. § 2307.60, adoption and ratification).

## COUNT TWO
### (Duress and Coercion)
*Dutton v. Dutton*(1998), 127 Ohio App. 3d 348

94. Smith incorporates all prior paragraphs of this complaint as if fully rewritten herein.

95. The Defendants jointly and severally acted wrongfully to attempt to oust Smith from her position as councilmember utilizing surprise duress and coercion against her.

96. As a result of the duress and coercion intentionally utilized by the Defendants, Smith has suffered harm, economically, emotionally, and non-economically for which she has a right to remedy.

97. The taxpayers, likewise, will suffer harm if the individual Defendants are not required to reimburse Huber Heights and obey the law.

## COUNT THREE
### (Political Discrimination)
*Painter v. Graley* (1994), 70 Ohio St. 3d 377

98. Smith incorporates all prior paragraphs of this complaint as if fully rewritten herein.

99. The wrongful actions and other legally redressable wrongs and damages proximately caused by the Defendants to Smith, were caused without just cause and wrongfully imposed because of political, (not part of the "team", could not be 100% controlled by the leadership of Council, "personal issues" with City Manager and others, etc.) and other proscribed reasons, each of which was a substantial factor in Defendants' actions.

100. The conduct by Defendants constituted a violation of civil, property, liberty, reputation, privileges, and immunities, and other rights under R.C. Chapter 4112, et al., and the law of

Ohio, as well as a violation of the City Charter prohibiting Defendants from political or other discriminatory actions.

101. The aforesaid discrimination and wrongful conduct of Defendants is redressable under State law, which provides relief for resulting injury and damages to Smith. Relief and remedy under federal law is not sought hereby.

### COUNT FOUR
**(Violation of Public Policy)**
*Painter v. Grailey* **(1994), 70 Ohio St. 3d 377;** *Kulch v. Structural Fibers* **(1997), 78 Ohio St. 3d 134;** *Collins v. Tizkana* **(1995), 73 Ohio St. 3d 65;** *Cruz v. South Dayton Urological Assocs.* **(1997), 121 Ohio App. 3d 655**

102. Smith incorporates all prior paragraphs of this complaint as if fully rewritten herein.

103. The treatment of Smith by Defendants was in violation of public policy, as prohibited by specified provisions of the City Charter and Ohio law, and set forth herein, which proximately resulted in damages to Smith.

### COUNT FIVE
**(Common Law Conspiracy)**
*Kenty v. Transamerica Premium Ins. Co* **(1995), 72 Ohio St. 3d 415**

104. Smith incorporates all prior paragraphs of this complaint as if fully rewritten herein.

105. The goals of the aforesaid Defendants were unlawful and the combined efforts of two or more of the Defendants, acting individually, ultra viresly, and outside of their official duties, made the goals obtainable.

106. In the alternative, the Defendants have, outside the official duties, conspired to, adopted and ratified the wrongful conducts of each other.

107. The conspiracy to oust Smith from office for wrongful reasons, in violation of her employment, in violation of City Charter, State Constitution, State statutory law, and State common law proximately resulted in damages to Smith.

**COUNT SIX**
(Conspiracy to Violate Civil Rights; State Action, R.C. 4112.01 et seq.)
*Singer v. Fairborn* (1991), 73 Ohio App. 3d 809; *Kenty v. Transamerica Premium Ins. Co.*
(1995), 72 Ohio St. 3d 415

108. Smith incorporates all prior paragraphs of this complaint as if fully rewritten herein.

109. The Defendants named individually unlawfully conspired with each other to deny Smith her civil rights when they met and were observed meeting for purposes of planning and then unlawfully discriminating and disparaging Smith for improper reasons pursuant to Ohio Revised Code 4112.01, et seq. and other applicable law, as set forth herein.

110. Further, Defendants acted in violation of Ohio Revised Code 4112.01, et seq. by discriminating against Smith based on her sex and disability.

**COUNT SEVEN**
(Intentional/Negligent Infliction of Emotional Distress)
*Garrison v. Bobbitt* (1999), 134 Ohio App. 3d 373

111. Smith incorporates all prior paragraphs of this complaint as if fully rewritten herein.

112. The Defendants maliciously, intentionally, recklessly, or (minimally) negligently inflicted severe emotional distress upon Smith.

113. The conduct of the Defendants was outrageous and blatantly unlawful.

114. The resulting harm was severe and of a nature that should not be tolerated in a community that operates under the protection of the law.

115. The resulting distress has been severe and proximately resulted in damages to Smith.

**COUNT EIGHT**
(Punitive Damages)
*Preston v. Murty* (1987), 32 Ohio St. 3d 334

116. Smith incorporates all prior paragraphs of this complaint as if fully rewritten herein.

117. The Defendants named individually have acted legally maliciously or in such reckless disregard of the law, jointly and severally, that punitive damages are assessable as a matter of right against them. The City of Huber Heights, under these circumstances, has no statutory immunity as it is, itself, corporately liable for punitive, as well as compensatory, damages because of adoption/ratification and conspiring, making a taxpayers' action for recovery of same necessary.

### COUNT NINE
**(Tortious Interference With Right To Petition Government, Due Process/Equal Protection)**
*Singer v. Fairborn* **(1991), 73 Ohio App. 3d 809;** *Tri-County Concrete Co. v. Uffman-Kirsch*
**(2000) 8th Dist. No. 76866, 2000 Ohio App. LEXIS 4749**

118. Smith incorporates all prior paragraphs of this complaint as if fully rewritten herein.

119. The conduct of the Defendants caused Smith to be denied her constitutional right to effectively petition the City of Huber Heights for a hearing as required under the law and under her rights to pre and post-termination due process, including but not limited to disciplinary, name-clearing, and other hearings upon due notice, for cause, and with full opportunity to defend with legal representation, subpoena power, and right to cross-examination prior to her termination.

120. The conduct of the Defendants prohibited the public from having access to truthful information, any advance knowledge or notice of any kind prior to the execution for the conspired action and allowing them to utilize their right to petition their government, vis-à-vis the Defendants.

121. All rights to due process (substantive and procedural) were intentionally denied to Smith and the public by the Defendants' wrongful conduct, which proximately resulted in damages to Smith.

<u>COUNT TEN</u>
(Taxpayers Suit)
O.R.C. §733.59, *State ex rel. Citizens for Better Portsmouth v. Sydnor* (1991),
**61 Ohio St. 3d 49**

122. Smith incorporates all prior paragraphs of this complaint as if fully rewritten herein.

123. Smith avers that the conduct of the Defendants, jointly and severally, was in violation of the
State laws, State Constitution, and City Charter, requiring tax moneys to be used only for the
stated purpose for which they were levied and collected and to be expended for the aforesaid
employment of Smith and not to finance Defendants' unwarranted persecution of Smith or
defense of the same.

124. The City Charter specifically provides for the City, through the Law Director, to enforce its
public duties and Charter, and when they do not, for Plaintiffs to do so.

125. Defendants' disregard of the duties aforesaid is a violation of the rights of the taxpayers to
have their money used for purposes intended, as well as judiciously, and the right to prohibit
further losses of taxpayers' funds through continued persecution of Smith and frivolous
defenses to prevent her occupancy and enforcement of her public office.

126. Upon the findings of the Court, the Defendants will have to pay Smith money for damages;
the Defendants having caused a misuse of taxpayers money, and same should be prohibited
and enjoined with appropriate remedy provided not only to Smith but to the taxpayers, and
judgment issued against the individually named Defendants, to be made to pay the damages
and expenses of the wrongful persecution of Smith or otherwise indemnify the City funds
for same.

23

<u>COUNT ELEVEN</u>
**(Defamation, Libel and Slander [per se, per quod, and otherwise false light])**
*Mallory v. Ohio University*, 2002-Ohio-7406; *McCartney v. Oblates of St. Francis deSales*
**(1992), 80 Ohio App. 3d 345**

127. Smith incorporates all prior paragraphs of this complaint as if fully rewritten herein.

128. The publications of facts about Smith by the Defendants, who as adopted and ratified by them, were jointly and severally false.

129. The Defendants acted maliciously in that they knew they were false or legally malicious in that they acted in reckless disregard of, or failed to reasonable ascertain, the truth of said statements of fact.

130. The statements of fact were false and were defamatory to Smith and to her family.

131. The defamatory publications and republications were maliciously made, or caused to be made by the Defendants, were both in writing and by spoken word and constituted libel and slander per se, per quod, and otherwise, were defamatory in that they were about her profession and imputing criminal conduct to her.

132. The statements were intended for an ulterior, derisive, and improper purpose to cause Smith to be coerced into resigning her position to avoid being wrongfully subjected to unnecessary and adverse public scrutiny, being placed in a defamatory false light, and untruthful criticisms of her professional ability.

133. The malicious intent of Defendants was to impugn the reputation and professional ability of Smith and thereby present a false representation that Smith was incapable of doing her job, while violating the laws as aforesaid.

134. The statements falsely published did lead to the assertion by Defendants and understanding that she was not competent, or as competent, able, willing, fit, and deserving of merit, dishonest, or financially irresponsible.

24

135. The false publications did proximately result in harm to Smith's professional and personal reputation.

136. The aforesaid wrongful conduct has caused and will continue to cause Smith harm, resulting in economic and non-economic damages to her professional and personal life.

137. Smith and her husband, Mr. Smith, have suffered great emotional distress, loss of reputation, and other harm, entitling them, separately, to compensatory and punitive damages.

**COUNT TWELVE**
**(Invasion of Privacy)**
*Housh v. Peth* (1956), 165 Ohio St. 35

138. Smith incorporates all prior paragraphs of this complaint as if fully rewritten herein.

139. Smith, as well as her husband and children, had a reasonable expectation of privacy as to her future plans for personal activity, employment, retirement, and other professional and personal rights which is individual and entitled to privacy.

140. The right to freely choose the course of one's employment and aforementioned rights is a private right enjoyed by Smith and she is entitled to be free from interference and exposure to the public.

141. Further, Smith and her family had a reasonable expectation of privacy as it related to their social security number and other personal identifiable information (PII) being shared on social media.

142. The Defendants, jointly and severally, wrongfully and maliciously invaded upon Smith's right to privacy and usurped said right by advocating for her censure, removal from her position as a councilmember, and by sharing her unredacted PII with the public.

143. The statements put Smith in a false light to the public and exposed her to criticism, ridicule, questions, and other matters which she did not want published or presented to the public without her consent.

144. The Defendants further wrongfully invaded the privacy of Smith's husband and children by exposing them to matters to which they were entitled to privacy.

145. The aforesaid wrongful conduct caused and will cause Smith, and children, economic and non-economic injuries for which compensatory and punitive damages must be awarded.

**WHEREFORE**, the Plaintiffs, jointly and severally, pray for judgment against the Defendants, jointly and severally, as both public officials and individually, respectively for the following relief:

1) Each Plaintiff demands compensatory damages for the aforesaid wrongful and tortious conduct in an amount greater than Twenty-Five Thousand Dollars ($25,000.00);

2) Each Plaintiff demands punitive damages for the torts in an amount greater than Twenty-Five Thousand Dollars ($25,000.00);

3) Plaintiff, Janell Smith, demands compensatory damages for her employment rights (ex lege, ex contractu, and otherwise) in an amount greater than Twenty Five Thousand Dollars ($25,000.00), currently estimated at Two Million Two Hundred Twenty Five Thousand Dollars ($2,225,000.00) together with consequential damages estimated at Two Million Five Hundred Thousand Dollars ($2,500,000.00).

4) Plaintiff Janell Smith demands punitive damages for the said breach of employment and other rights (non-tort) in an amount greater than Twenty Five Thousand Dollars ($25,000.00), and at least Two Million Dollars ($2,000,000.00);

5) Plaintiffs demand that they be awarded all costs and attorney fees; and

6) That the Court declare this action a taxpayers' suit; and

7) That the Court issue Declaratory Judgment, a Writ of Mandamus, Permanently, Peremptorily, and/or alternatively, Specific Performance, Injunctive Relief, and

other extraordinary relief as plead in the above complaint and otherwise as justice demands; and

8) That the Court specifically address the rights of Plaintiffs to seek damages directly from Defendants named individually or to seek reimbursement from the City from said individual Defendants for any damages, costs, or attorney fees awarded;

9) For all the relief provided under R.C. Chapter 4112, City Charter, and Ohio law for deprivation of civil rights; and

10) For all other further relief, either at law, equity, or by extraordinary and special relief to which the Plaintiffs are entitled.

Respectfully submitted,

*/s/ Michael P. McNamee*

Michael P. McNamee (0043861)
Gregory B. O'Connor (0077901)
Alexander W. Cloonan (0095690)
**McNAMEE & McNAMEE, PLL**
2625 Commons Blvd.
Beavercreek, Ohio 45431
Email: mmcnamee@mcnameelaw.com
Email: goconnor@mcnameelaw.com
Email: acloonan@mcnameelaw.com
Tel: (937) 427-1367 // Fax: (937) 427-1369
*Attorneys for the Plaintiff*

## JURY DEMAND

The Plaintiffs hereby demand a trial by jury in the within matter.

*/s/ Michael P. McNamee*

Michael P. McNamee (0043861)

27